Matter of Kingston V. (Javon V.) (2025 NY Slip Op 00126)

Matter of Kingston V. (Javon V.)

2025 NY Slip Op 00126

Decided on January 9, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:January 9, 2025

CV-23-0126
[*1]In the Matter of Kingston V., Alleged to be a Neglected Child. Clinton County Department of Social Services, Respondent; Javon V., Appellant.

Calendar Date:November 20, 2024

Before:Clark, J.P., Lynch, Reynolds Fitzgerald, Ceresia and Powers, JJ.

Michelle I. Rosien, Philmont, for appellant.
Clinton County Department of Social Services, Plattsburgh (Patrick J. McFarlin of counsel), for respondent.
Andrew F. Bailey, Plattsburgh, attorney for the child.

Clark, J.P.
Appeal from an order of the Family Court of Clinton County (Keith M. Bruno, J.), entered December 19, 2022, which granted petitioner's application, in a proceeding pursuant to Family Ct Act article 10, to adjudicate the subject child to be neglected.
Respondent (hereinafter the father)[FN1] and Kristin M. (hereinafter the mother) are the parents of the subject child (born in 2020). The mother and the father each have older children with different parentage, and each parent has a prior finding of neglect pertaining to his or her own separate children. The two met while the father was on parole and the mother was on probation. Despite a condition of the mother's probation requiring that she stay away from the father, the two engaged in a romantic relationship and the mother became pregnant with the subject child. In February 2021, petitioner commenced a neglect petition against the mother and temporary orders were entered requiring her to keep the subject child away from the father, among other conditions. The child remained in the mother's care until August 5, 2021, when she was arrested for violating the terms of her probation. Pursuant to a safety plan, the mother and petitioner agreed to place the child in the care of the paternal grandmother, who was directed to keep the father away from the subject child. On August 27, 2021, upon learning that the father had taken the child from the grandmother's care, petitioner sought to remove the child; Family Court granted said application and placed the child in petitioner's care. The father refused to return the child, requiring the intervention of the State Police to safely recover the child. Petitioner brought the instant neglect petition against the father in October 2021. The petitions against the mother and the father proceeded to a lengthy combined fact-finding hearing, after which Family Court found that both parents had neglected the subject child and continued the child's placement in foster care with petitioner. The father appeals.
"A party seeking to establish neglect must show, by a preponderance of the evidence, first, that a child's physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired and second, that the actual or threatened harm to the child is a consequence of the failure of the parent or caretaker to exercise a minimum degree of care in providing the child with proper supervision or guardianship" (Matter of Raquel ZZ. [Angel ZZ.], 216 AD3d 1242, 1243-1244 [3d Dept 2023] [internal quotation marks and citations omitted]; see Family Ct Act §§ 1012 [f] [i] [B]; 1046 [b] [i]). Notably, "[a] finding of neglect requires only an imminent threat of injury or impairment, not actual injury or impairment, and such threat may be established through a single incident or circumstance" (Matter of Emmanuel J. [Maximus L.], 149 AD3d 1292, 1294 [3d Dept 2017]; see Nicholson v Scoppetta, 3 NY3d 357, 369 [2004]; Matter of Thomas XX. [Thomas YY.], 180 AD3d 1175[*2], 1176 [3d Dept 2020]). "In determining whether [a parent] failed to exercise a minimum degree of care, the critical inquiry is whether a reasonable and prudent parent would have so acted, or failed to act, under the circumstances" (Matter of Joseph GG. [Chrystal FF.], 227 AD3d 1238, 1239 [3d Dept 2024] [internal quotation marks and citations omitted]; see Matter of Paul U., 12 AD3d 969, 971 [3d Dept 2004]). "Family Court's factual findings and credibility determinations are accorded great weight in such a proceeding and will not be disturbed on appeal unless they lack a sound and substantial basis in the record" (Matter of Nathanael E. [Melodi F.], 160 AD3d 1075, 1076 [3d Dept 2018] [citations omitted]; see Matter of Annaleigh X. [Ashley Y.], 205 AD3d 1109, 1111 [3d Dept 2022]).
Here, the record reflects that the father had a prior finding of neglect stemming from a 2007 incident where he went to retrieve his infant daughter from the care of her maternal grandparents. Due to their observations of the father on that day, the grandparents became concerned that the daughter would be unsafe in his care and declined to turn her over. In response, the father used a metal shovel to hit the grandfather in the head and took the daughter. The grandfather suffered a skull fracture as a result of the father's conduct and was hospitalized. The order finding neglect, which was entered upon the father's default, noted that attempts to locate the father had been unsuccessful, that a warrant had been issued for his arrest and that he had "unaddressed anger issues[ and] unaddressed mental health issues." As a result of that same 2007 incident, the father faced criminal charges and, following a jury trial, was convicted of assault in the second degree and criminal possession of a weapon. The father was sentenced to five years in prison for the former and to an indeterminate prison term between 2 and 6 years for the latter, to be followed by three years of postrelease supervision. In 2016, the father was charged and convicted on two counts of criminal sale of a controlled substance in the fourth degree and sentenced to concurrent prison terms of four years, to be followed by three years of postrelease supervision. The father was released from prison in late 2019, and his parole officer testified that the father was required to complete programming to address his domestic violence and anger management issues due to the 2007 assault of a family member. The parole officer further testified that although he had encountered a lot of angry people in his line of work, the father was by far the angriest person he had ever met. Yet, the father refused to complete such programs as he believed he had no need for them. The record is replete with evidence that belies the father's belief.
One instance of the father's untreated anger issues occurred when the child was four days old and one of petitioner's caseworkers met with the mother at her home. The father was present and very [*3]confrontational, so the mother and the caseworker went outside to speak. As they spoke, the father kept opening the door to verbally assault the caseworker and to insist that the mother not cooperate. At one point, the father stood by the doorway, holding the subject child precariously against his body with one hand and using his other hand to record the caseworker on his phone. The caseworker observed that the father was extremely agitated, and she grew concerned that he was more focused on insulting, intimidating and filming her [FN2] than on safely holding the child. As a result, she asked the father to hold the newborn child with more care, but the father disregarded said request. The caseworker also noted that the child was not dressed appropriately to be outside, as it was a very cold day.
The father also demonstrated his inability to control his anger after the mother was imprisoned for a violation of probation in August 2021. At that time, the mother and petitioner agreed to place the child with the paternal grandmother, so long as the grandmother agreed to keep the child away from the father. Although he was aware of that requirement, and without any legal right to do so, the father opted to take the child from the grandmother's care; he then left the child in the care of an unfamiliar individual. The father refused to return the child, requiring petitioner to enlist the help of the State Police and Parole; with their assistance, the child was safely retrieved from another county the following day. In addition, the record includes a plethora of recorded phone calls between the father and the mother. In some of those calls, the two discussed plans for the father to abscond with the child to another state.[FN3] Throughout the recorded calls, the father displayed many outbursts of anger and aggression, made numerous threats to hurt and kill the mother's family and petitioner's caseworkers, among others, used despicable and hateful language to refer to the mother's other children and angrily yelled at the family pets, who could be heard in the background of some of the calls.[FN4] Further, despite his later denials at the hearing, one of those recorded conversations involved the father acknowledging that there was domestic violence between him and the mother, though he blamed the mother for such incidents becoming physical.
Having reviewed the record, we disagree with the father's contention that Family Court's finding of neglect was based on the court's distaste for the father's courtroom conduct. Rather, the record reflects that the father failed to behave as a reasonably prudent parent when he prioritized his own anger at the caseworker above ensuring that the newborn child was held securely or dressed for the cold weather, and again when he took the child from the grandmother's care and planned to abscond out of state. The 2007 neglect finding — which may serve as evidence of neglect of the subject child (see Family Ct Act § 1046 [a] [i]) — further [*4]makes clear that the father's anger has long been out of control and untreated. Indeed, despite the effect that the father's behavior has had on his relationship with his older children,[FN5] the father continued to deny and minimize his conduct, and he refused to engage in the recommended treatment (see Matter of Baylee F. [Jeanette E.], 231 AD3d 1318, 1321-1322 [3d Dept 2024]). Under these circumstances, and deferring to Family Court's credibility determinations, we are satisfied that a sound and substantial basis exists in the record to support the finding that the father failed to exercise a minimum degree of care and that such failure placed the subject child at imminent risk of harm (see Matter of Ja'Sire FF. [Jalyssa GG.], 206 AD3d 1076, 1078-1079 [3d Dept 2022], lv denied 38 NY3d 912 [2022]; Matter of Kaelani KK. [Kenya LL.], 201 AD3d 1155, 1156-1157 [3d Dept 2022]; Matter of Kathleen NN. [Dennis NN.], 154 AD3d 1105, 1107-1108 [3d Dept 2017]). The father's remaining contentions, to the extent not addressed herein, have been considered and lack merit.
Lynch, Reynolds Fitzgerald, Ceresia and Powers, JJ., concur.
ORDERED that the order is affirmed, without costs.

Footnotes

Footnote 1: As the mother was married to another individual at the time of the child's birth, the mother's husband was the child's presumptive legal father (see Family Ct Act § 532 [a]). The father commenced a proceeding in May 2021 seeking to rebut that presumption and establish his own paternity. That matter remained pending until May 2022, when an order of filiation established him as the child's legal father.

Footnote 2: The father posted the video to social media.

Footnote 3: These phone calls were recorded by the county jail where the mother was housed, and the mother went as far as using a different incarcerated individual's phone account in an attempt to conceal their plans.

Footnote 4: The father denied that he ever engaged in such behavior.

Footnote 5: The father has not seen his older children since they were infants.